**H & M MOVING, INC.**

v.

**The UNITED STATES.**

No. 37–73.

United States Court of Claims.
June 19, 1974.
As Amended Oct. 4, 1974.

---

William W. Scott, Washington, D. C., attorney of record, and Barton J. Menitove, Washington, D. C., for plaintiff; Collier, Shannon, Rill & Edwards, Washington, D. C., of counsel.

Clarence T. Kipps, Jr., Washington, D. C., for The National Security Industrial Association, amicus curiae; John L. Rice and Miller & Chevalier, Washington, D. C., of counsel.

Rose E. Adewale-Mendes, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

BENNETT, Judge:

Plaintiff, H & M Moving, Inc., a District of Columbia corporation, brings this contract action under section 2 of the Wunderlich Act, 41 U.S.C. § 322. In moving for summary judgment, plaintiff maintains that the failure of the Department of Commerce Appeals Board (DCAB), Docket No. OAS–1, February

28, 1972,[1] to award travel time payments for the period from September 1, 1969 through May 11, 1970, was an error of law redressable in this court. Defendant has filed a cross-motion for summary judgment contending that the board was correct in disallowing travel time payments for the period from September 1, 1969 through May 11, 1970 (count I), but that the board erred in awarding plaintiff travel time for the period from May 12, 1970 to January 31, 1971 (count II), the date the contract in question terminated. For reasons which shall be set out, the court concludes that the DCAB result was correct but only in part and for the wrong reason and that plaintiff is entitled to recover for all travel time under the contract and all extensions thereof because of plaintiff's reasonable interpretation of a latent ambiguity in the contract written by defendant.

On August 15, 1969, plaintiff received a solicitation for bids for moving services to be performed in the District of Columbia metropolitan area for the Department of Commerce. The solicitation invited bids for straight, night and overtime rates to be paid under a moving contract. Plaintiff was awarded the contract, No. 0-35009, on September 10, 1969.

Article XI of the contract, entitled Payment, provided in part as follows:

Billing for contractual services rendered shall be submitted monthly to the designated "COTR" appropriate paying office as shown on the Task Order, in the form of an itemized invoice covering all services furnished during the month. The invoice shall be supported by the time cards or suitable time sheets for each Contractor's employee signed by the authorized Commerce Department COTR as evidence of hours worked by each employee of the Contractor. The time card shall indicate the date worked, number of hours worked and hourly rate for each employee.

Article II A-3, which contained a provision for travel time payments, is the contract section which gave rise to the dispute here at issue. That section provided:

In determining hours worked on a particular job, the Government will allow reasonable time for travel to and from the Contractor's place of business to the job location. Such time allowed will be a minimum of thirty (30) minutes and a maximum of sixty (60) minutes depending upon the location of the job.

When it entered into this contract, H & M was conducting the great percentage of its business with the Government. The travel time provision, however, had never previously been in a contract between H & M and the Government. The DCAB found that the travel time provision was an unusual one in Government moving contracts. As a result, no general understanding existed in the moving industry regarding the interpretation of the clause. Unknown to plaintiff, the travel time provision had been placed in Department of Commerce moving contracts in 1967 and 1968 in order to permit movers to bill for truckdrivers who drove trucks from the mover's place of business to the jobsite and back and who were paid by the mover for such services. Plaintiff's president, Robert E. Mee, knew that a similar travel time provision had been part of a series of contracts between another moving service and another Government agency during 1961-64. Plaintiff also knew that said moving company charged for and was paid for such travel time from 1961 through early 1964 even though it did not pay its employees for such travel time. Plaintiff did not know, however, that when the other agency learned that the moving company was not paying its employees for the travel time, it stopped such payments, recaptured those it had made, and terminated the contract.

H & M's bid for laborers' straight time was $3.78 per hour and for labor-

1. 72-1 BCA ¶ 9330.

ers' overtime, $4.55 per hour. The hourly rates bid for straight time by the next three lowest overall bidders were, respectively, $3.85, $3.95, $3.88. The overtime rates bid by these bidders were, respectively, $5.78, $3.95, and $4.50. All of these bids were found by the DCAB to have been competitive.

H & M performed moving services under the contract for eight separate bureaus of the Department of Commerce. They were as follows: Office of the Secretary (OAS), Patent Office (Patent), Economic Development Administration (EDA), Maritime Administration (MARAD), Census Bureau (Census), National Oceanic Atmospheric Administration (NOAA), Office of Minority Business Enterprise (OMBE), and Office of Business Economics (OBE).

The DCAB found that when Mr. Mee bid on the moving contract he construed the travel time provision to allow H & M to charge and collect for one hour per day per man for travel time in addition to the hours actually worked. Consequently, Mr. Mee pegged his bid for the laborers' straight time rate at 50 and 52 cents below the rate he was charging other Government agencies under two other contemporaneous contracts which had no similar travel time provision. Since Mr. Mee believed that H & M could charge one hour per day per man for travel time at the overtime rate, he expected that H & M would be able to recover the difference between its hourly bid on the instant contract and its bid on the two other contracts.

During the course of its performance on the instant contract, H & M only paid travel time to those of its employees assigned to report to H & M's place of business in order to drive H & M's trucks to the moving site. No other H & M employees were paid for travel time, even though some others reported to work at H & M's premises. Throughout the performance period of this contract, H & M obtained some extra employees from Labor Pool, Inc., an employment service for temporary employees located approximately 2 or 3 miles from the Main Commerce Building where most of the work under the contract was performed. On a normal contract day, H & M trucks would leave H & M's premises with those employees who reported directly there, stop by Labor Pool to pick up whatever temporary help was needed and then proceed to the moving site, where still other part-time employees reported direct. It was stipulated before the DCAB that at least 85 percent of the H & M employees who worked on the Commerce contract did not punch in at H & M's warehouse and were not transported to and from H & M's place of business.

H & M began its performance early in September, 1969. Regular bills were submitted monthly to Commerce for services performed by H & M. It was not until February 1970, however, after H & M's accountant had determined that H & M was losing money on the contract, that H & M discovered that it was not charging Commerce for travel time, even for its truckdrivers. As soon as Mr. Mee learned of H & M's billing omission, he sought and obtained a meeting, in early March, with Carroll J. Cummings, chief of the Contract Administration Branch, Procurement Division, Office of the Secretary, Department of Commerce. At the meeting Mr. Mee informed Mr. Cummings of H & M's failure to bill for travel time. The two men did not, however, discuss whether H & M transported all its employees to the jobsite or whether it paid them for travel time.

As a result of their conversation, Mr. Cummings instructed Mr. Mee to submit bills for the unbilled travel time accompanied by a statement from H & M's legal counsel that such billing was proper. The board found that Mr. Cummings made this request because he associated travel time provisions in previous Government contracts only with payments for truckdrivers, whereas Mr. Mee was applying the travel time provision to all H & M employees on the job. Mr. Cummings did not believe that a claim would be made for travel time

unless plaintiff had been paying its employees for the same. Mr. Mee, however, never told Mr. Cummings that H & M was paying all its men for travel time. What Mr. Mee did tell Mr. Cummings at their first meeting was that on his lawyer's advice H & M did not have to pay its employees travel time in order to collect the same under its contract with the Government. Though Mr. Cummings was skeptical of this interpretation, he did not pursue it since he considered it to be a hypothetical statement and not the basis for H & M's claim for travel time.

H & M on April 23, 1970, submitted its bill for back travel time direct to Mr. Cummings at his request. The bill, received by Mr. Cummings on April 28, 1970, was accompanied by a letter indicating that H & M's "legal counsel advises that the billing is in order." The bill was directed to six agencies of Commerce and totaled approximately $27,822.[2] Where an employee had worked 8 hours or more on a particular day, the billing was at the overtime rate. Where an employee had worked less than 8 hours, the billing was figured at the straight-time rate. In both instances, pursuant to Mr. Mee's interpretation of article II A–3, one extra hour of time was billed for each employee day.

Mr. Cummings turned the invoices for back travel time over to his subordinate, a Mrs. Margaret Matta, but gave her no instructions concerning the invoices. Mr. Cummings, however, expected that Mrs. Matta would send the invoices to the appropriate contracting officer's technical representative (COTR) and that the invoices would be checked pursuant to article XI of the contract, *supra,* before they would be approved for payment. Mrs. Matta, however, sent the invoices to the appropriate COTRs without any accompanying instructions.

Payments on the invoices for retroactive travel time were sporadic and without any particular pattern. The Patent Office was the first agency to make payment in full. They did so on May 12, 1970. EDA followed with its full payment on May 18, 1970, and NOAA paid its full amount by the end of July 1970. None of the other three agencies, Census, MARAD or OAS, paid the invoices for retroactive travel time submitted to them. In April 1970 H & M also began regular monthly billing for travel time. Certain of the agencies paid from the time of initial billing and throughout the entire contract period while other agencies did not.[3] A review of the payments made reveals no particular pattern. No explanation was given by Census or MARAD, either at the time the invoices were submitted or at the DCAB hearing, for their failure to pay the retroactive billings. Considerable testimony, however, was given at the DCAB hearing with respect to OAS's refusal to pay the retroactive travel time invoices.

Howard Spicer, the OAS COTR, testified that sometime during the month of May 1970, he learned that the H & M employees were not being transported to the jobsite from H & M's premises, but were, instead, reporting directly to the jobsite. Mr. Spicer indicated he informed Mr. Cummings of this fact orally, along with a recommendation that H & M should not be paid travel time for such employees.

2.  OAS, $10,169; Patent, $8,083; EDA, $6,191; MARAD, $2,795; NOAA, $441; Census, $143.

3.  Board finding 51 delineates the respective periods of payment and non-payment. The board record does not disclose why some of the bureaus chose to pay only a portion of H & M's travel billings during particular months covered by the contracts. Further, the amount of travel time billed and paid is not clearly established. Approximately $67,500 was billed; approximately $31,000 was paid; approximately $36,500 was not paid. The record does not show how much travel time paid and unpaid is for drivers and any others who may have actually been paid by plaintiff for actual travel to and from company headquarters to jobsites and how much is applied to employees who were not paid by plaintiff. The sums are subject to audit of plaintiff's records. Some payments were made for travel time through Jan. 1971.

At about the same time, Mr. Cummings and Mrs. Matta were making inquiries into the propriety of travel time payments. Information received from a Labor Department official and a union official indicated that it was the practice in the moving industry to pay employees for travel time when they punched in at the employer's place of business. Early in June, in response to an inquiry of Mrs. Matta, Mr. Mee disclosed that most of H & M's employees came to the jobsite by company truck. This information and advice received from the Labor Department and union officials caused Mr. Cummings to send a June 8, 1970 memorandum to J. H. Montroy, chief of the Procurement Division, indicating it appeared that, under the circumstances already noted, the Government was required to make travel time payments not only for drivers but also for laborers.

Upon receiving the Cummings' memorandum, Mr. Montroy dispatched another memorandum (prepared by Cummings) to David Larkin, deputy director for Operations, indicating that the travel time matter had been explored with the Office of the General Counsel and that there was no question but that the Government was required to pay travel time where a contractor transports his workers to a jobsite from his place of business and return.

On June 23, 1970, Cummings sent a memorandum to each of the COTRs informing them that the travel time clause required the Government to pay for travel time where a contractor transports his personnel from the warehouse to the jobsite and back. The COTRs were instructed to make sure that the contractor complied with this requirement before they authorized travel time payments. At the time of his memorandum, Cummings had some suspicion that plaintiff's laborers were not being transported to the jobsite and were not being paid for travel time. Cummings did not believe the Government was required to pay travel time unless the same was also paid by plaintiff to his laborers.

Cummings' suspicions were confirmed in late June or early July 1970 when Spicer informed him that H & M was not paying its employees travel time. Spicer set his discovery down in writing in an August 5, 1970 memorandum to Cummings. At about this same time Cummings learned that some of the agencies were making regular monthly travel time payments. He presumed, however, that these payments were being made pursuant to his June 23, 1970 memorandum.

Discussion followed between H & M's attorney and representatives of the Department of Commerce concerning the proper interpretation of the travel time clause. H & M contended that it did not have to pay its employees travel time or transport them to and from the jobsite in order to collect travel time payments for one hour per day from the Government. In September 1970, counsel for H & M informed Cummings that the company was receiving travel time payments from some of the agencies and reiterated its aforesaid grounds of entitlement for invoices not paid. On September 24, 1970, H & M wrote Cummings complaining about nonpayment of travel time by other agencies. Cummings replied on October 26, 1970. Cummings' letter was not a final decision, but he did set down his interpretation of the travel time provision:

(a). "The Government may only pay for hours worked by each of the Contractor's employees under this contract, inclusive of travel time, where such travel time does, in fact, exist as evidenced by appropriate records as called for in the contract and confirmed by the individual charged with monitoring such performance on behalf of the Department."

(b). "The Contractor is to return any monies improperly paid for travel time not actually incurred and verified as provided in the contract." [72–1 BCA at 43,265.]

Cummings' letter marked the first time the Government advised H & M in writing with respect to its interpretation of

the travel time clause. Further discussions betwen the parties followed and Government audits of H & M's records were conducted in December 1970 and again after this claim had been brought in August 1971. The December 1970 audit disclosed that there were no records to support plaintiff's travel time requests. Plaintiff's attorney vigorously disputed the results of this audit and requested that a contracting officer's decision be issued promptly so that H & M could begin its appeal procedure.

Cummings issued his formal, final decision on May 19, 1971. He rejected H & M's interpretation of the travel time provision and announced:

"It is my decision, therefore, that you are entitled to be paid for travel time under Article II–A–3 as follows: (1) for each employee you actually paid for his travel time separate and apart from the time he actually worked at the jobsite; and (2) at the applicable labor hour rate contained in the Pricing Schedule; and (The 'Overtime Rate' will be applicable for hours worked in excess of eight hours each day only if you paid the employee the time and one-half overtime rate required by law.) and (3) for travel time between your place of business to the particular job location and return; (I will allow the maximum one hour as the reasonable time for such total travel in each instance.) and (4) for which proper records evidence actual compensation paid by you to each employee for travel time as the basis for your travel time billings." [72–1 BCA at 43,265.]

The letter also indicated that as of January 31, 1971, H & M had been paid approximately $30,000 in travel time. Such payments, other than to truckdrivers, who reported to H & M's place of business and who were paid for travel time between H & M's place of business and the jobsite to which they ultimately reported, were deemed to have been improperly made, and demand was made for repayment of these sums. Plaintiff was also advised of its right to appeal the decision and did so.

The moving contract in question was extended three times by agreement of the parties—on August 31, 1970, extended through November 2, 1970; on November 4, 1970, extended through December 31, 1970; and on December 23, 1970, extended through January 31, 1971. At the time of these extensions both parties were aware of the dispute regarding the proper interpretation of the travel time clause. Neither party, however, requested that the language of the travel time provision be amended for purposes of the contract extension. H & M's president, Mr. Mee, expected that H & M would be paid for travel time through the extension periods. Otherwise, he would not have agreed to the contract extension.

The foregoing is a summary of the facts as found by the DCAB which the parties and the court are obliged to accept under well-established authority, since the findings are not arbitrary, capricious, fraudulent or in bad faith, but are supported by substantial evidence. 41 U.S.C. § 321; Tri-Cor, Inc. v. United States, 458 F.2d 112, 198 Ct.Cl. 187 (1972). We turn now to the board's opinion and decision which both parties challenge here, in part.

The board posed two basic questions raised by the parties as the framework for its decision. The questions are:

(1) What is the correct interpretation of the travel time provision of the contract?

(2) Do principles of equitable estoppel bar the Government from refusing to pay travel time except for those employees of H & M who were paid travel time by it? [72–1 BCA at 43,266.]

At first blush, nothing seems ambiguous about article II A–3 of the contract which says that the Government "will allow reasonable time for travel to and from the Contractor's place of business to the job location." However, from

the very beginning, there was confusion about it. Plaintiff by its bid read the language to mean that it would be paid for travel time of employees whether they were paid for it by plaintiff or not and whether or not those employees traveled to and from plaintiff's place of business to the jobsite. The words "will allow" were interpreted to be words of commitment and promise. Some of plaintiff's competitors interpreted the language exactly as plaintiff does, and so did a majority of the payor agencies within the department. On the other hand, other competitors interpreted the language as the defendant now does and as stated in the May 19, 1971 decision of Mr. Cummings, the contracting officer. Cummings, however, was quite uncertain himself about the meaning as the dispute developed and appears from the board opinion to have construed the contract clause in five different ways at one time or another. It was not until his letter of May 19, 1971, that he clearly took defendant's present position. The board opinion lists 10 points about the clause which raise legitimate concerns about its meaning from defendant's point of view and, while these arguments supporting defendant's position have some merit, the board also listed numerous ambiguities in the contract language which led it, inevitably, to conclude:

> While it may be that the Government intended the travel time provision to apply only when the contractor actually required his men to punch in at the warehouse, carried them to-and-from the job site, and paid them for such travel time, *it is not at all clear that the Government conveyed this intention to the contractor by plain and unambiguous language* in the unique contract provision here involved which the Government drafted. *The rule of contra proferentem applies in such circumstances,* requiring us to give more weight to the contractor's position. (A. L. Harding, Inc. DCAB No. PR–44, 65–2 BCA 5261.)

From our reading of the contract in the light of the testimony and docu-

mentary evidence, *we believe H & M cannot be considered unreasonable in interpreting the travel time provision* as allowing the contractor to be paid for travel time, regardless of not paying its workers for same. \* \* \*. [72–1 BCA at 43,267. Emphasis supplied.]

The defendant has wisely abandoned use of this troublesome contract clause, following the present contract. The court agrees that the clause is ambiguous. "The rule has long been established that a provision in a contract which is unclear, and capable of being interpreted in at least two reasonable ways, is ambiguous." Chris Berg, Inc. v. United States, 455 F.2d 1037, 1044, 197 Ct.Cl. 503, 514 (1972). We conclude that the board was correct in so deciding upon the record before it, and we further conclude that the ambiguity was latent, not patent. As the board further said:

> \* \* \* we find in this case that the dispute about the proper interpretation of the travel time provision is one about which, despite the Government's intended meaning, reasonable persons could and did differ reasonably. \* \* \*. [72–1 BCA at 43,269.]

We turn now to the board's consideration of the second question, *i. e.,* whether the Government is barred by principles of equitable estoppel from refusing to pay travel time to plaintiff for the time of employees plaintiff did not require to punch in at its place of business, did not convey between there and the jobsite, and did not pay for travel time.

The board noted that both sides relied on the case of United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970), where the Government was also involved in a contractual capacity, for a proper enunciation of the doctrine of equitable estoppel as being one "based on considerations of justice and good conscience." In the above case, the Ninth Circuit cited one of its earlier opinions, California State Board of Equalization v. Coast Radio Products, 228 F.2d 520, 525 (9th Cir. 1955), which set out the

four elements necessary to establish the defense of estoppel. They are:

(1) The party to be estopped must know the facts.

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended.

(3) The latter must be ignorant of the true facts.

(4) He must rely on the former's conduct to his injury.

Discussing the foregoing and other applicable legal propositions and applying them to the facts of the instant case, the board concluded that none of the four elements listed above was present in the period between September 1969 and early March 1970. The board's analysis to support its conclusion need not be restated but we conclude that it was fully justified and accurate. The board, however, stated further:

> * * * The most that could be argued by H & M is that the Government, as drafter of the contract, was responsible for its uncertainties, if relied on by H & M to its detriment. By performing under the contract with the interpretation H & M says it held from the time it bid for the contract, H & M argues that it will lose its expected profit, to its detriment, unless paid its claim for travel time over the period between September 1969 and early March 1970. The fatal weakness of this argument is that H & M contributed largely, if not wholly, to this six-month detriment by omitting to claim for travel time promptly and regularly after September 1969. Had it done so, the difference of interpretation might well have been revealed early in the course of performance, thereby giving H & M and the Government a quick opportunity to reach a mutual understanding or terminate the contract, without the detriment that flowed from performance over six months.

> It is settled law that to receive equity, one must do equity. As H &

M's delay in presenting its first travel time claim was not the Government's fault, H & M must accept this consequence. Its six months' delay bars H & M from holding the Government for any ambiguity in the contract that H & M may have relied on in that period. [72–1 BCA at 43,270.]

The board then ruled that any payments made for the time of employees who were not paid by plaintiff for such time between September 1969 and May 12, 1970, were erroneous, and that the Government was entitled to recoup such payments.

The board, however, did apply estoppel against defendant after May 12, 1970, the date of the first Government payment on the retroactive travel time invoices. The Patent Office's payment was found by the DCAB to have given plaintiff "reasonable cause to believe that the Government tacitly accepted or acquiesced in H & M's aforementioned interpretation of the travel time provision," 72–1 BCA at 43,271, notwithstanding such payments were erroneous and notwithstanding absence of any specifications in the retroactive billings, as required by the contract. Applying again the four elements required to establish estoppel, the board found that as a result of the retroactive payment the defendant—

> * * * (1) knew of the facts regarding H & M's interpretation of the travel time provisions, or enough of them to have put a reasonably prudent party on inquiry; (2) so acted, by paying the invoices without question, as to give H & M reasonable cause to believe that the Government accepted its interpretation of the travel time provision; whereas (3) H & M was not informed by the Government of its intended interpretation; and (4) H & M had cause to rely and did rely on the payments as conduct justifying its continuance to perform under the contract and to extend it, to H & M's detriment or injury. [72–1 BCA at 43,271.]

The five ultimate conclusions of the board were as follows:

(1) The travel time provision did not clearly provide for payment of travel time by defendant when the contractor did not transport and pay its employees for their time of travel between the contractor's place of business and the jobsite. It was ambiguous.

(2) Plaintiff was entitled to be paid by defendant for travel time under the contract and all extensions thereof with respect to all workers plaintiff both transported to and from the jobsite and paid for time of such travel between September 1, 1969 and January 31, 1971.

(3) Regarding employees plaintiff had on the job prior to May 12, 1970, and did not pay for travel time, regardless of whether plaintiff transported them thereto, plaintiff is not entitled to be paid under the contract and defendant is not estopped by any actions during that period.

(4) Defendant can recover from plaintiff for travel time payments made to plaintiff for those employees to whom plaintiff did not pay travel time between September 1, 1969 and May 12, 1970.

(5) By reason of the respective actions of the parties on and after May 12, 1970, defendant is estopped to withhold payment of travel time from plaintiff with respect to employees on the job between that date and January 31, 1971, even though plaintiff did not pay such employees for travel time during that period.

Plaintiff, thereafter, filed a petition in this court to which defendant filed an answer and counterclaim. The counterclaim was for recovery of amounts alleged to have been erroneously paid by defendant to plaintiff for travel time of plaintiff's employees who were neither transported by plaintiff nor paid for travel time by plaintiff. Plaintiff's brief makes these four main arguments:

(1) Defendant has no authority to seek judicial review of part or all of the contract clause decision favorable to the contractor.

(2) The DCAB erred as a matter of law in interpreting the travel time provision of plaintiff's contract.

(3) The DCAB erred as a matter of law in failing to apply the *contra proferentem* rule to construe plaintiff's contract.

(4) The DCAB decision that the Government was estopped as of May 12, 1970, from asserting its interpretation of the contract must be affirmed.

We will consider these points in the order stated.

### I

It is defendant's position that because plaintiff has initiated a review of that portion of the board's opinion adverse to it, plaintiff has reopened the whole case and defendant can in its own turn attack that part of the board decision adverse to it because the two parts are related and were the subject of one appeal and one board decision. At issue here, of course, is the impact of S&E Contractors, Inc. v. United States, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972), which held that where there is a standard disputes clause in the contract, the Government cannot challenge an ultimate administrative decision adverse to it. We have the disputes clause here also, but in *S&E* the Court did not have before it a situation such as here where part of the decision on plaintiff's claim was favorable to plaintiff and part unfavorable. There, the plaintiff accepted the board decision *en toto*. However, plaintiff points out that neither fraud nor bad faith are involved here and *S&E* said that neither the Wunderlich Act nor the disputes clause permits defendant's interference with the concept of a final board decision, in the interests of a "quick and efficient administrative remedy," absent a showing of such defect in the administrative findings of fact or law. Plaintiff thus argues that it is entitled to summary judgment against defendant's counterclaim and judgment in plaintiff's favor on count I of the petition and that *S&E* precludes de-

fendant from any challenge to factual and legal conclusions by the DCAB. These are intriguing questions but because of the decision we reach here, the court does not find it necessary to resolve them in this case.

## II

Plaintiff's second contention is that the DCAB was wrong as a matter of law in not interpreting the travel time provision to provide for Government payment for travel time in instances where the contractor did not transport its employees to and from the jobsite or pay them for their travel time. Plaintiff also disputes the DCAB holding that article II A–3 was ambiguous.

■■■ It is settled law that a board decision is not final on an issue of contract interpretation. 41 U.S.C. § 322. Counsel for both parties agree on this point and the precedents are clear and numerous, starting with United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). An administrative opinion, however, is entitled to weight and respect when it is based on sound reasoning and is in accord with court decisions. We have studied and considered the myriad semantic distinctions drawn by counsel from the disputed contract clause in their attempt to convince us that the meaning of article II A–3 is crystal clear. The very fact, however, that the contract clause is subject to so much distinction, controversy, and confusion is strong evidence of its ambiguity. The contract provision is not clarified by reference to other clauses or to specifications, to Labor Department regulations, to the Service Contract Act, to implied conditions, nor by reference to conflicting interpretations surfacing for the first time months after the contract became operative. Faced with these problems, we believe the board was correct in holding that the contract was susceptible to more than one reasonable interpretation and in concluding that plaintiff's interpretation was reasonable.

## III

In our discussion of the DCAB opinion a portion of it was quoted wherein the board concluded that whatever the defendant's intention was in the travel time provision it was not conveyed to the contractor in plain and unambiguous language, that the plaintiff contractor's interpretation of the contract clause on travel time was not unreasonable, and that under the circumstances the *contra proferentem* rule must apply and "more weight" must be given to plaintiff's position in the matter. This conclusion of the board is the heart and soul of the case before the court. It is a rejection of defendant's contention throughout that the contract language is clear and unambiguous and only properly can be construed as defendant interprets it—to deny travel time payments claimed by plaintiff. Carrying the board's conclusion to its logical end suggests recovery for plaintiff on its entire case. But, the board which has supported its conclusion by a meticulous recitation from the record showing the various interpretations given to the contract clause by the defendant and its steady, single-minded interpretation by plaintiff, does not apply the *contra proferentem* rule to plaintiff's full advantage. The board decision grants plaintiff recovery only on that portion of its claim after May 12, 1970, as to which defendant is deemed estopped by retroactive payments it now disclaims, and bars recovery to plaintiff for the earlier part of the contract period on the grounds that plaintiff failed to bill monthly for the travel time payments ultimately made retroactively by defendant. This extraordinary effort to emulate Solomon by cutting the baby in twain cannot be supported either in logic or law.

We do not say and the board did not say that defendant's view of the contract language was unreasonable. Indeed, defendant has argued with eloquence and force that it is plain on its face and that plaintiff's interpretation is unreasonable and unconscionable. But, such allegedly plain language does

not cause lawsuits, is not dropped from future contracts, and does not result in conflicting interpretations by those in the trade and least of all by defendant's own contracting officers and payor agencies. What the board properly concluded was simply that "the dispute about the proper interpretation of the travel time provision is one about which, despite the Government's intended meaning, reasonable persons could and did differ reasonably." 72–1 BCA at 43,269. This is not the first time the court has had such a problem. In WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963), the court said:

> * * * As with so many other agreements, there is something for each party and no ready answer can be drawn from the texts alone. Both plaintiff's and defendant's interpretations lie within the zone of reasonableness; neither appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap; the arguments, rather, are quite closely in balance. It is precisely to this type of contract that this court has applied the [contra proferentem] rule * * *. [See also United Pacific Ins. Co. v. United States, Ct.Cl., 497 F.2d 1402 (June 1974); Kenneth Reed Constr. Corp. v. United States, 475 F.2d 583, 201 Ct.Cl. 282 (1973); J. W. Bateson Co. v. United States, 450 F.2d 896, 902–903, 196 Ct.Cl. 531, 543–544 (1971); Thompson Ramo Wooldridge, Inc. v. United States, 361 F.2d 222, 175 Ct.Cl. 527 (1966); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); Restatement Contracts § 236(d) (1932).]

In Sturm v. United States, 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970), this court stated:

> * * * This oft-repeated and much-applied rule serves important purposes. It puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms;

and it saves contractors from hidden traps not of their own making.

■ Certainly, the ambiguity complained of here was not patent, which is to say, obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start. We have here only such an ambiguity, latent in character, as to require that it be construed against the author—here the defendant—when the other party construes it in a reasonable manner, i. e., in the "zone of reasonableness." In employing such a sensible and proven doctrine, the courts and the board have determined that the behavior of the contractor is the key element in a contra proferentem situation. While such is necessarily the case for purposes of determining that a contractor has acted reasonably in interpreting the contract in the way he did, such cannot be a consideration for determining how far the contra proferentem doctrine should be applied once it has been determined to be applicable. This is because the doctrine, by its very nature, implies and contemplates a contractor who has no duty to inquire of the Government about the meaning of the language used in the contract. That duty arises only when the contract is patently ambiguous. If the contractor's behavior has been within the zone of reasonableness and the language is latently ambiguous, the contractor is not on notice that his interpretation might be wrong and that he is required to inquire. In this case, defendant stoutly insists that the language is not patently ambiguous, except as an alternative defense.

Thus, while the board has determined that the travel time provision was one about which reasonable men could and did differ, and one about which plaintiff adopted a reasonable interpretation not that different from the interpretation adopted by some other bidders, the board is somehow reluctant to apply the contra proferentem rule in plaintiff's favor. The only reason the board advances for this is that plaintiff through its own innocent and admitted fault failed to bill defendant in timely fashion for charges due under its interpretation

of the contract, a period for which the board bars recovery. The board says that plaintiff's conduct may have led the Government to believe that plaintiff was accepting defendant's interpretation of the contract. Of course, the board has also said that defendant had not imparted its interpretation to plaintiff. The board's argument is the same thing as saying that plaintiff failed to notify the board of its determination of the travel time provision, something plaintiff had no duty to do under the board's own reading of the case. The board equates such billing with a duty to inquire about a patent ambiguity, which it declined to find existed. We can only speculate what defendant might have done had plaintiff submitted its bills more promptly. The board concludes that defendant would have been alerted and would have protected itself against claims it now rejects. But, this is a weak position because when plaintiff ultimately did submit its bills, defendant began paying them which it ultimately decided it should not have done and for which it counterclaims here. Both sides thus made some mistakes. If these amount to waivers the parties are stalemated, "faded" in a classic standoff as to what might have been had they acted differently. So, it makes better sense in resolving this dispute to consider only what the parties did.

If the board decision is allowed to stand, it will establish a significant exception to the *contra proferentem* rule. The conduct of the parties in future cases will be significant in the degree to which the rule can be applied. The difference formerly recognized between latent and patent ambiguity will be fuzzed, if not lost. In both instances a plaintiff will be required, to gain full recovery, to inform the Government of its interpretation of each and every contract clause whether it thinks a clause is ambiguous or not. It otherwise risks denial of a future claim for every word for which it fails to provide such notice. A reasonable interpretation of ambiguous language would be to no avail, absent such notice. Such a rule would militate against the making of Government contracts.[4]

■ What the board has really done here, without saying so, is to apply the doctrine of laches against plaintiff for its failure to bill promptly in the first few months of the contract. This delay, the board says, bars plaintiff's recovery for the period prior to May 12, 1970. It further represents that defendant relied upon plaintiff's conduct to its detriment. Here we have the elements of laches and it is the only basis for board rejection of a part of plaintiff's claim. What the board did not seem to realize is what the court stated in Kaiser Alum. & Chem. Corp. v. United States, 388 F.2d 317, 319, 181 Ct.Cl. 902, 906–907(1967):

> * * * this court has not accepted the defense of laches as applying to contract actions against the Government; that defense has been confined to personnel suits for unlawful removal, suspension, or demotion from a federal position, and the court has given special reasons for its application to that area. [Citations omitted.] So far as the court is aware, no case in this court has applied the doctrine as a defense to a contract action. * *.

We find, then, that the board was in error as a matter of law in denying recovery to plaintiff for travel time claimed prior to May 12, 1970. Having correctly found, as a matter of law, that the language of the contract was ambiguous and subject to more than one reasonable interpretation, the board then found as a matter of fact, which binds us, that plaintiff's interpretation thereof

---

4. The court has held that, absent a timely warning by a contractor aware of a Government breach, the contractor who continues to perform cannot recover because his failure to notice deprived the Government of a choice to continue or to end performance. Ling-Temco-Vought, Inc. v. United States, 475 F. 2d 630, 201 Ct.Cl. 135 (1973). Neither an ambiguous contract clause nor the *contra proferentem* rule was involved in that case, however. In the instant case plaintiff did notify defendant of its interpretation of the contract travel time clause as soon as plaintiff discovered it had not billed thereunder but intended to do so.

was reasonable. That should have ended the matter, but then the board erroneously applied the doctrine of laches, an equitable remedy not available in construing contract terms, to bar recovery. It is the *contra proferentem* rule which governs this case and entitles plaintiff to recover on its entire claim. WPC Enterprises, Inc. v. United States, *supra*. As the board found, plaintiff relied on its own reasonable interpretation of defendant's ambiguous language and thereby suffered detriment through its low bid occasioned thereby. For this reliance and loss plaintiff is entitled to recover. Dale Ingram, Inc. v. United States, 475 F.2d 1177, 201 Ct.Cl. 56 (1973); Astro-Space Labs., Inc. v. United States, 470 F.2d 1003, 200 Ct.Cl. 282 (1972); Randolph Eng'r Co. v. United States, 367 F.2d 425, 176 Ct.Cl. 872 (1966).

## IV

■ We turn, finally, to the board's conclusion, challenged by defendant, that after May 12, 1970, defendant was estopped from denying travel time payments to plaintiff because defendant's payment therefor gave plaintiff reasonable cause to believe the Government acquiesced in plaintiff's interpretation of the travel time provision of the contract. Defendant has counterclaimed for payments said to have been inadvertently and erroneously made and denies responsibility for any others demanded by plaintiff. Defendant concedes that estoppel can be applied against it in a proper case but not where its moneys are erroneously paid out by its employees. Defendant's position is predicated upon its theory that its interpretation of the travel time clause is the only reasonable one and that the board decision is wrong.

Defendant's interpretation is that after May 12, 1970, all payments for time were erroneous, except for plaintiff's truckdrivers, and were unauthorized.

Plaintiff counters that defendant has no authority to challenge recovery awarded by the board under the principles of the *S&E* decision, *supra*. Additionally, plaintiff argues that estoppel does apply here because the board found as a fact that after the first payment for travel time on May 12, 1970, plaintiff relied on defendant's acceptance of plaintiff's interpretation of the contract travel time clause by continuing performance, and by extending the contract, which was unprofitable to plaintiff without the travel time allowance. As heretofore noted, the extensions were made in August, November and December 1970. Defendant continued to honor some of plaintiff's billings for travel time through January 1971. A caution was expressed by the contracting officer on October 26, 1970, but a formal adverse decision by the contracting officer did not come until May 19, 1971. Conduct by plaintiff under the circumstances was found reasonable by the board. We are bound by the board findings unless they violate Wunderlich Act standards. To the extent the findings are mixed with conclusions of law we can reconsider them but find no basis in this record to do so. Defendant's arguments are mooted.

The difficulty we have with the board's use of estoppel in this case is that it found the contract ambiguous, plaintiff's interpretation reasonable, and *contra proferentem* applicable. Estoppel implies that defendant's interpretation of the travel time provision was correct throughout and only intervening action of the Government in paying travel time, even if erroneous, prevented the defendant's interpretation from prevailing for the entire contract period. Again we must conclude that the board opinion is wrong on the law and is internally inconsistent. The rule of *contra proferentem* governs the law of this case. The board's findings of fact are accepted by the court. Plaintiff is entitled to recover on both counts of the petition for breach of contract. The board's errors of law in interpreting the contract lack finality under 41 U.S.C. § 322 and are rejected.

## CONCLUSION

Upon the foregoing opinion, plaintiff's motion for summary judgment is grant-

ed, defendant's cross-motion for summary judgment is denied, and defendant's counterclaim is dismissed. Pursuant to Pub.L. 92–415 (codified at 28 U.S.C. § 1491) and Rules 149 and 150, this case is hereby remanded to the Department of Commerce Appeals Board (DCAB) for determination of the amount of recovery due plaintiff in accordance with the court's opinion of June 19, 1974. Further judicial proceedings shall be stayed for a period not to exceed six months from the date of this order. The attorney of record for the plaintiff is hereby designated as the responsible reporting attorney under Rule 149(f).

DAVIS, Judge (concurring in part and dissenting in part):

I believe that the Department of Commerce Appeals Board reached the correct result, and for appropriate reasons, and so I depart from the court's opinion, though only partially from the judgment.

The Board considered the travel-time contract clause, found it to be ambiguous, mentioned the *contra proferentem* rule, but nevertheless decided the controversy on the grounds of equitable estoppel. The majority thinks it error for the Board to have taken this last step—once *contra proferentem* is found applicable, the result is thought to be mandated. I do not disagree that the clause was ambiguous or that it should be read against the drafter, the Government. But in my view the court's position on equitable estoppel misconceives the nature and role of that doctrine, and its relation to the construction-against-the-drafter rule of contract interpretation.

Before examining the application of estoppel to this dispute, it is helpful to note two important characteristics of this principle. First, it is not a tool of contract interpretation. Although courts and other tribunals will sometimes regard the conduct of the contracting parties when choosing between the cusps of an ambiguity,[1] this kind of conduct-analysis is distinct from that forming the basis of an estoppel.[2] It is clear that the Commerce Board was not ascertaining the meaning of the contract by observing the parties' behavior under it; rather, it was weighing events by the more exacting tests of equitable estoppel. The kind of conduct that gives rise to an estoppel must be appraised more strictly (the action or inaction must be relatively unambiguous, the parties must be unequally knowledgeable about the situation, etc.) because, as noted below, this defense can be imposed against a party whether or not its interpretation of a contract ambiguity is accepted by the court.

Neither can it be said that the *contra proferentem* rule and estoppel are on a par in the hierarchy of legal values and analytical techniques.[3] "Equitable estoppel is a rule of justice which, in its proper field, prevails over all other rules." United States v. Georgia-Pacific Co., 421 F.2d 92, 96 (C.A.9, 1970). The reason for this pre-eminent position is organic to the nature, goals, and operation of the doctrine. "Equitable estoppel in the modern sense arises from the *conduct* of a party, using that word in its broadest meaning * * *. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of the law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair dealing, to create

---

1. *See, e. g.,* Dynamics Corp. of America v. United States, 389 F.2d 424, 430, 182 Ct.Cl. 62, 73 (1968); 3 Corbin on Contracts § 558 (1960); Uniform Commercial Code § 2–208.

2. Although the two legal principles are different and distinguishable, they both spring from the common-sense proposition that, at least in civil litigation, a person should normally be held to account for the plain implications of his overt actions, whether or not he privately harbors another view.

3. One important commentator views *contra proferentem* as a residual method, to be used "as a last resort" only after all other techniques of contract interpretation fail to resolve the ambiguity. 3 Corbin on Contracts § 559, at 262, 268–70 (1960).

and vest opposing rights in the party who obtains the benefit of the estoppel." 3 Pomeroy's Equity Jurisprudence § 802, at 180 (5th Ed. 1941). The principles of equitable estoppel are foreign neither to this court nor to the substantive law of government contracts,[4] and we should not shy away from giving the doctrine full effect whenever a proper case arises. Paying due deference to this venerable principle of justice may require, as here, overriding the result indicated by a lesser rule (such as one of contract interpretation). But when a good case for estoppel is made out, I would not hesitate to put first things first.

Given the legal function and priority of equitable estoppel, I see no error in the Board's consideration of this issue in spite of its earlier conclusions (the accuracy of which I accept) that the contract clause was ambiguous and the rule of *contra proferentem* applies. As stated above, the nature of an estoppel is that it overrides and cuts down other legal rights and claims, such as these flowing from the rule that a non-drafting party can charge its opponent with responsibility for a latent unclarity.

Utilizing the accepted elements of equitable estoppel, the Board sought to find whether the contractor had given the Government, to its detriment, reasonable cause to believe that the former was not interpreting the contract as requiring travel-time payments. The contractor had the duty (set forth in Article XI, quoted in the court's opinion) to submit monthly bills "in the form of an itemized invoice *covering all services* furnished during the month." (Emphasis added.) In proper context, silence in the presence of an obligation to disclose is sufficient to create an estoppel, and this contract, which puts the burden of claiming payments due every month squarely on the contractor's shoulders, called upon plaintiff to inform the defendant of all items believed to be owing.[5] I agree with the Board that "by not billing for travel time or even raising the subject until March 1970, the contractor can be deemed to have led the Government to believe that it was accepting the [Government's] intended interpretation of the contract." 72–1 BCA ¶ 9330 at 43,269.

In addition, the Board rightly found "detriment" in the substantial delay foreclosing the Government's opportunity to sidestep an incipient dispute quickly and cheaply. "Had [H & M claimed promptly and regularly for travel time], the difference of interpretation might well have been revealed early in the course of performance, thereby giving H & M and the Government a quick opportunity to reach a mutual understanding or terminate the contract * * *." 72–1 BCA at 43,270. It is unnecessary to speculate, as the court does, as to what the Government would have done had it received a prompt bill, early in the course of performance, for travel time. To find the detriment needed for estoppel, it is enough that the *opportunity* for loss-avoidance was denied, as it was here. *Cf.* Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 201 Ct.Cl. 135 (1973), discussed *infra.* On these bases, the Board seems to me quite right in holding plaintiff estopped from claiming pre-May 12, 1970, travel-time payments.[6]

---

4. *See, e. g.,* Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 1000, 184 Ct.Cl. 169, 194 (1968) ; United States v. Georgia-Pacific Co., 421 F.2d 92 (C.A.9, 1970) ; United States v. Hanna Nickel Smelting Co., 253 F.Supp. 784, 793–795 (D.Or.1966).

5. Since the contract was bid and paid on a man-hour basis, these bills were the only way that proper payment could be made. The importance of the billing duty is amplified by the fact that H & M's method of paying its workers departed, at least in large part, from industry practice. *See* H & M Moving, Inc., DCAB–OAS–1, 72–1 BCA ¶ 9330, at 43,-266. Thus, the only way the Government could have learned of H & M's interpretation, or the legal problems arising from it, was to be put on notice by a complete monthly bill.

6. The Board found that H & M first gave notice of an intent to bill for travel time around February 1970, that the first bill was presented late in April, and that the first payment was made on May 12 of the same year. It was not compulsory to decide the beginning

The court, as I see it, puts the wrong construction on this administrative holding. The Board did not interpose the defense of laches, or any equivalent. This is not a case where delay in asserting a claim is considered so inequitable as to bar the demand, but rather, as the Board found, H & M's affirmative conduct, by failing to include travel time in a supposedly complete bill, misled the defendant to its detriment, thereby precluding plaintiff from now recovering the travel-time money. And the Board, in considering the failure to bill travel time as raising an estoppel, did not (as the majority also implies) assume that H & M had a duty to inquire whether the Government shared its interpretation of the unclear clause. Instead, in the setting of the contractual duties created by Article XI, *supra,* H & M's failure had the consequence of misleading the Government, lulling it into the belief that there was no interpretative dispute, and that travel time (for the months before the issue ripened) was neither claimed nor owed. Though the plaintiff may have had no duty to inquire, it did have the obligation not to lead the defendant astray.

Such misrepresentation by silence is reminiscent of the recent case of Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 201 Ct.Cl. 135 (1973). That plaintiff charged a Navy official with inducing it, by false promises and representations, to fund a contract overrun. The court refused to award damages on this theory, however, because shortly afterwards plaintiff learned of the falsity of the alleged misrepresentations, but nonetheless continued to perform the contract and expend money on it in total and unexplained silence, "knowing all the time that the Navy did not intend to reimburse it for such expenses and that the Navy thought and continued to think that the plaintiff fully agreed to that course." 475 F.2d at 636, 201 Ct.Cl. at 145. Similarly, H & M submitted bills, which it should have known the Government would consider full and complete claims for payment, without mentioning the significant matter of travel time.[7]

The Board also held that H & M was entitled to payment for the post-May period, likewise on the ground of estoppel— this time the defendant's ox being gored. The court confirms this result, but only on the basis that the contract, correctly read, decides the issue. I agree that that is one proper ground, but at the same time I think that the Board's view furnishes an alternative basis for the same result. After the emergence of the dispute over contract interpretation, payment of travel-time bills by authorized officials was sufficient in this instance to estop the Government from later claiming that travel time was not payable, on H & M's interpretation, for periods after the payments had begun.[8]

and end of the estoppel period with mathematical exactitude, and the Board was within its discretion in selecting the May date.

7. It maks no difference that H & M's failure to bill travel time may have been the result of its own innocent error, because the Government, like any other contracting party, is entitled to rely on the overt and objective actions of contractors. Cf. *Ling-Temco-Vought, Inc., supra,* 475 F.2d at 639, 201 Ct.Cl. at 150.

8. As the Board found:
"Applying again the four elements required to establish estoppel, we find that by the time of the mid-May payments of retroactive travel time to H & M, the Government (1) knew of the facts regarding H & M's interpretation of the travel time provision, or enough of them to have put a reasonably prudent party on inquiry; (2) so acted, by paying the invoices without question, as to give H & M reasonable cause to believe that the Government accepted its interpretation of the travel time provision; whereas (3) H & M was not informed by the Government of its intended interpretation; and (4) H & M had cause to rely and did rely on the payments as conduct justifying its continuance to perform under the contract and to extend it to H & M's detriment or injury." 72–1 BCA at 43,271.
It is now settled that the Government, as contracting party, may be estopped. The sole question unique to imposing estoppel on the contracting sovereign is whether the officials acted within their authority. The Board considered this issue at length and found proper authority, *see* 72–1 BCA at 43,271–72. I concur in its analysis.

For these reasons, I would affirm the decision of the Department of Commerce Appeals Board, both in result and reasoning, and therefore would deny both motions for summary judgment.

KASHIWA, Judge, concurs in Judge Davis' dissent.